**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| K.O., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.:    20-309 (RC) |
| | : | |
| v. | : | Re Document Nos.: 51, 64, 66 |
| | : | |
| U.S. IMMIGRATION AND CUSTOMS | : | |
| ENFORCEMENT, *et al.*, | : | |
| | : | |
| Defendants. | : | |

<u>**MEMORANDUM OPINION**</u>

GRANTING DEFENDANTS' MOTION TO DISMISS;
DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Plaintiffs in this putative class action are minor non–United States citizen children who, after arriving in the United States either at or between designated ports of entry, were forcibly separated from their parents by the Department of Homeland Security (DHS) or one of its sub-agencies, Customs & Border Patrol (CBP), Immigration and Customs Enforcement (ICE), or U.S. Customs & Immigration Services (USCIS).  Their case arrived before this Court upon transfer from the District of Massachusetts.  In that court, Plaintiffs had filed their Complaint, ECF No. 1, and their First Amended Complaint ("Am. Compl."), ECF No. 45, asserting Constitutional and related statutory claims against a number of individual federal officials, including the former Attorney General, the now-former Secretary of DHS, the now-former White House Chief of Staff, and a Senior Advisor to the President (collectively, with others identified below, "the individual Defendants").  The individual Defendants moved to dismiss the First Amended Complaint.  *See* Mot. Dismiss, ECF No. 51.  While that motion was pending, Plaintiffs sought leave to amend their complaint a second time.  They proposed to add the United States as

a defendant and to add eight counts against the United States under the Federal Tort Claims Act (FTCA). Pls.' Mot. for Leave to File Second Am. Compl. ("Mot. Amend"), ECF No. 64. The individual Defendants opposed this, as did the United States, which appeared specially for the limited purpose of opposing the motion.

Judge Hillman of the District of Massachusetts granted the individual Defendants' Motion to Dismiss for lack of personal jurisdiction and improper venue. Mem. of Decision and Order ("Mem."), ECF No. 86. He transferred the case to this District pursuant to 28 U.S.C. § 1631. *Id.* at 14. Judge Hillman did not address the individual Defendants' additional arguments that the First Amended Complaint should be dismissed for failure to state a claim, and he explicitly left the Motion to Amend open for this Court to resolve. *See id.* at 14 & n.9.

The Court has received supplemental briefing from Plaintiffs, from the individual Defendants, and from the United States. The individual Defendants maintain that the First Amended Complaint should be dismissed for failure to state a claim. Plaintiffs' motion to file a Second Amended Complaint adding claims against the United States is opposed by both the individual defendants and by the United States, which is still not a party. In addition to these pending motions, the individual Defendants have filed a Notice of Related Case, ECF No. 90, which the Court also addresses here. For the reasons stated below, the Court dismisses the First Amended Complaint for failure to state a claim, and denies leave to file a Second Amended Complaint.

## I. BACKGROUND

This Memorandum Opinion primarily concerns a motion to dismiss for failure to state a claim and a motion to amend a complaint. On a motion to dismiss for failure to state a claim, the Court accepts as true the factual allegations in the complaint and construes them liberally in the

Plaintiffs' favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  When considering a motion to amend a complaint, the Court evaluates the proposed amended complaint by applying essentially the same standard it would on a motion to dismiss.  *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 181–82 (1962)).  Accordingly, for now, the Court accepts as true the Plaintiffs' factual allegations in their complaints.  In recounting the alleged factual background the Court cites to the First Amended Complaint for two reasons.  First and foremost, that complaint is operative at this time.  Second, the facts of the case pertain much more to the individual Defendants' arguments in their motion to dismiss the First Amended Complaint for failure to state a claim, whereas the arguments against leave to file a Second Amended Complaint are almost wholly procedural.  As described below, the arguments against leave to amend concern the procedural history of the claims against the United States, and these procedural arguments have nothing to do with the claims against the individual defendants.  Because of the completely separate sets of arguments on the two motions, there is little risk of confusion, especially considering that the two complaints are substantively identical with regard to the individual Defendants.  *Compare* First Am. Compl., *with* Proposed Second Am. Compl. ("Prop. Compl."), ECF No. 64-1 (alleging nearly identical facts, and adding only claims against the United States and acknowledgment of certain of the individual defendants' departures from positions in the government).

### A.  Legal and Factual Background

Many non-citizens arriving in the United States without immigration documentation are subject to the "expedited removal" proceedings created in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104–208, 110 Stat. 3009–546

(codified as amended in scattered sections of 8 U.S.C.).  These procedures were intended "to

expedite the removal from the United States of aliens who indisputably have no authorization to

be admitted" while allowing those claiming asylum the opportunity to have their claims heard.

*Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018) (quoting H.R. Rep. No. 104-828 at

209 (1996)).  Under the Refugee Act of 1980, any non-citizen "who is physically present in the

United States or who arrives in the United States . . . irrespective of [their] status, may apply for

asylum."  8 U.S.C. § 1158.  Under "expedited removal" procedures, the Department of

Homeland Security may remove an alien from the United States "without further hearing or

review[,] unless the alien indicates either an intention to apply for asylum under [8 U.S.C.

§ 1158] or a fear of persecution" supporting a claim to withholding of removal.  *Id.*

§ 1225(b)(1)(A)(i).  Non-citizens in "expedited removal" are nonetheless eligible to pursue

asylum provided they demonstrate a credible fear of persecution.  *Id.* § 1225(b)(1)(B).  They are,

however, to be "detained pending a final determination of credible fear of persecution and, if

found not to have such a fear, until removed."  *Id.* § 1225(b)(1)(B)(iii)(IV).

     Detention of minors is handled differently from detention of adults.  The Stipulated

Settlement Agreement in *Flores v. Reno* ("the *Flores* Agreement"), Am. Compl. Ex. 1,

Stipulated Settlement Agreement, Flores v. Reno, No. 85-4544-RJK(Px) (C.D. Cal. Jan. 17,

1997), ECF No. 45-1, is foundational for many later-enacted statutes and regulations governing

the detention of minors in immigration detention.  It defines a minor as "any person under the

age of eighteen (18) years who is detained in the legal custody of the [Immigration and

Naturalization Service,]" which was the predecessor to those agencies involved in this litigation.

*Id.* at 4.  The *Flores* Agreement requires the federal government to "place each detained minor in

the least restrictive setting appropriate to the minor's age and special needs" and "to treat all

minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." *Id.* at 7.  It also requires that "[w]here the [government] determines that the detention of the minor is not required either to secure his or her timely appearance before the [government] or the immigration court, or to ensure the minor's safety or that of others, the [government] shall release a minor from its custody without unnecessary delay." *Id.* at 9–10.  In order of preference, the government is required to release the minor to a parent, a legal guardian, an adult relative, another adult designated by a parent or legal guardian, a licensed program, or another adult individual "when it appears there is no other likely alternative . . . and family reunification does not appear to be a reasonable possibility." *Id.* at 9.

In 2002 the Homeland Security Act ("HSA") transferred a number of INS's immigration responsibilities to DHS, including to USCIS, CBP, and ICE.  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.  The Office of Refugee Resettlement (ORR) within the Department of Health and Human Services (HHS) was tasked with caring for children lacking "lawful immigration status in the United States" for whom "there is no parent or legal guardian in the United States; or . . . no parent or legal guardian is available to provide care and physical custody."  6 U.S.C. § 279(a)–(b), (g).  These minors are referred to as unaccompanied alien children or "UACs."  *See id.*  The Trafficking Victims Protection Reauthorization Act, passed in 2008 reaffirmed ORR's responsibilities in caring for UACs.  *See* 8 U.S.C. § 1232(a)(1).  Provisions of the TVPRA, as amended, codify the *Flores* Agreement's requirements that UACs in ORR custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child," ideally with "a suitable family member" but also with an organization if no family member is available.  *Id.* § 1232(c)(2)(A).  A UAC can be placed with a proposed custodian if HHS "makes a determination that the proposed custodian is capable of providing for the child's

physical and mental well-being," based on, "at a minimum . . . verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A).

While in DHS custody, individuals may be prosecuted for criminal violation of immigration laws under, among other provisions, *Id.* § 1325.  This statute makes it a crime for any noncitizen to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers," to "elude[] examination or inspection by immigration officers," or to "attempt[] to enter or obtain[] entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact." *Id.* § 1325(a).

### B.  Factual Background

#### 1.  Plaintiffs' Experiences

Two named plaintiffs in this putative class action are identified as K.O. and E.O., Jr. According to their pleadings, they arrived in Texas on May 19, 2018, having traveled from Mexico with their mother, identified as L.J.  Am. Compl. ¶ 138.  K.O. was nine years old at the time and E.O., Jr. was seventeen.  *Id.* ¶ 139.  After walking for several hours, the family was stopped by a CBP agent and driven to a border patrol detention facility.  *Id.* ¶¶ 140–43.  At the facility, E.O., Jr. was separated from his mother and sister and was taken to a crowded room full of other teenagers.  *Id.* ¶ 144–45.  K.O. and L.J. were taken to a different holding cell containing other mothers and younger children.  *Id.* ¶ 147.  After "[a]bout twelve to fourteen hours," L.J. was separated from K.O. and taken to another room with other mothers.  *Id.* ¶ 149.

L.J. was placed in criminal custody, indicted for illegal entry, and sentenced to time served after pleading guilty.  *Id.* ¶ 155.  She was then returned to civil immigration custody.  *Id.*

¶ 156.  At no point did the government suggest any "abuse, neglect, or unfitness," as a parent on L.J.'s part, nor was there any suggestion "that L.J. was not acting in the best interests of her children." *Id.*

K.O. and E.O., Jr. were placed on a bus together—but not permitted to touch one another—and were taken to a different immigration facility, where they were placed in cells facing one another. *Id.* ¶ 157.  They were not allowed to speak to one another. *Id.* ¶¶ 157–59. Younger children, including K.O., were crying, as was E.O., Jr. at times. *Id.* ¶¶ 161–62.  E.O., Jr. was accused of lying about his age and was kicked multiple times in the back by a federal agent. *Id.* ¶ 164.  K.O. had her hair pulled by federal agents. *Id.* at 165.

Federal agents offered E.O., Jr. the opportunity to go to another facility, but he refused to leave his sister alone. *Id.* ¶ 166.  E.O., Jr. and K.O. were both taken to another facility. *Id.* ¶ 167.  Federal agents told E.O., Jr. that his mother had been deported. *Id.*  The siblings were placed on an airplane, were not seated together, and were flown to Michigan. *Id.* ¶ 168.  E.O., Jr. and K.O. were sent to separate locations and federal personnel falsely told E.O., Jr. that they were being separated only temporarily. *Id.*

K.O. was placed with a foster family, along with other children who had been separated from their parents at the border. *Id.* ¶ 169.  E.O., Jr. was placed in a facility with other boys. *Id.* ¶ 170.  He attended school and was able to see K.O. there. *Id.*  After a few days, E.O., Jr. was able to speak on the phone for the first time with his father, identified as E.O., who lived in Westborough, Massachusetts. *Id.* ¶ 172; *see also id.* ¶ 154.  E.O., Jr. and K.O. were released and reunited with their father on June 19, 2018. *Id.* ¶ 174.

L.J. was kept for eight days in the facility where she was placed after losing her children. *Id.* ¶ 175.  She spoke on the phone with a person she believes to have been an asylum officer, but

was not allowed to call her husband, E.O. *Id.* She was then taken to another location, which she believes was an immigration detention facility in Taylor, Texas. *Id.* In mid-June 2018 she was told that she had established a credible fear that she would be persecuted if forced to return to Guatemala. *Id.* ¶ 176. She was released on June 26, 2018 and reunited with her family in Massachusetts. *Id.* ¶ 177. All four family members still suffer from trauma caused by the separation of the family, particularly K.O. *See id.* ¶¶ 178–79.

The third named plaintiff is identified as C.J. *Id.* ¶ 181. C.J. entered the United States on June 17, 2018 in El Paso, Texas, seeking asylum along with his father, identified as F.C. *Id.* C.J. was eleven years old. *Id.* They were seeking asylum based on threats from organized crime working with the police in Guatemala. *Id.* They approached a CBP vehicle together and were handcuffed and driven to a border patrol detention center. *Id.* ¶ 182. The facility was very cold and C.J. and F.C. were not given enough food. *Id.* ¶¶ 184–85.

F.C. was informed that he would soon be separated from his son. *Id.* ¶ 183. On June 20, 2018 CBP agents woke F.C. and C.J. and took them to a processing area. *Id.* ¶ 186. F.C. was separated from his son and taken to what he believes was a criminal court. *Id.* F.C. was not returned to the facility where C.J. was, and did not see him for over a month. *Id.* ¶¶ 187–88. C.J. was held in a facility with other children separated from their parents. *Id.* ¶ 196. He was very sad and came to believe he would never see his father again. *Id.* ¶ 198.

F.C. was taken to a criminal detention facility in which non-immigrants were being held. *Id.* ¶ 188. From there, he was taken to criminal court and told that he was being prosecuted for illegal entry. *Id.* ¶ 191. He was given the choice of leaving C.J. in the United States or being deported with C.J., and indicated that he wanted to remain with C.J. under any circumstances. *Id.* He was then moved to another criminal facility for two weeks, then to additional

immigration detention facilities.  *Id.* ¶ 192.  Eventually an employee at a detention center allowed him to speak with C.J. on the phone for five minutes.  *Id.* ¶¶ 192–93.  C.J. cried through the conversation.  *Id.* ¶ 193.  At some point thereafter F.C. was turned over to ICE custody.  *Id.* ¶ 195.

The government reunited C.J. and F.C. on July 26, 2018 at an immigration facility in Port Isabel, Texas.  *Id.* ¶ 199.  C.J. remains traumatized from the experience of being forcibly separated from his father.  *Id.* ¶¶ 199–202.  F.C. also suffered "life altering" trauma and it "will continue to affect [C.J. and F.C.'s] mental and emotional well-being for years to come."  *Id.* ¶ 202.

### 2.  Defendants' Alleged Policies

Defendants in this case are eleven named individuals and an unknown number of non-identified ICE Agents, CBP Agents and ORR personnel.  *See id.* at 1.  All Defendants are sued in their individual capacities.  *Id.* ¶¶ 17–30.  Named Defendants are the following: former Attorney General Jeff Sessions, former DHS Secretary Kirstjen Nielsen, former White House Chief of Staff John Kelly, Senior Advisor to the President Stephen Miller, Counsel to the Attorney General Gene Hamilton, former Director of ICE Thomas Homan, former Acting Director of ICE and former Acting Deputy Commissioner of CBP Ronald D. Vitiello, former USCIS Director L. Francis Cissna, former Acting DHS Secretary and former Commissioner of CBP Kevin McAleenan, HHS Secretary Alex Azar, and former ORR Director Scott Lloyd.  *Id.*  All defendants are alleged to have acted under color of federal law within the scope of their duties.  *Id.* ¶ 31.

According to Plaintiffs, the Defendants in 2017 instituted a widespread practice of separating migrant children from their parents by criminally prosecuting the parents for illegal entry, or at least referring them for prosecution.  *Id.* ¶ 48.  Criminally charging the parents would

mean transferring them to federal criminal custody, away from their children.  *Id.* ¶ 49.  Children were kept in "makeshift detention centers . . . in areas with no beds or mattresses," and some were abused by detention center employees.  *Id.* ¶ 70.  Health care is alleged to have been "often grossly inadequate."  *Id.* ¶ 71.  According to Plaintiffs, "[t]hese conditions of confinement further traumatized the children separated from their parents and traumatized the parents who were separated from their children."  *Id.* ¶ 72.  Government officials are also alleged to have lied to parents and children about why they were being separated or for how long.  *Id.* ¶¶ 65–67.

The children, who were no longer "accompanied" by their parents, would then be designated as UACs and transferred to ORR custody.  *Id.* ¶ 51.  Separated children were "not afforded counsel, process, or notice of their parents' whereabouts."  *Id.*  Classifying children as UACs delayed the reunification process because it meant parents had to apply as potential "sponsors" for their own children in order to get them out of ORR custody.  *Id.* ¶ 75.

According to Plaintiffs, the indefinite separation of children and parents was intended "to demonstrate the agony that parents should expect to experience [should] they dare to enter the United States without authorization with their children."  *Id.* ¶ 54; *see also id.* ¶ 79 ("The express purpose of the family separation was to deter immigration to the United States by instilling fear in migrants, particularly those from South and Central American countries.").  Plaintiffs suggest that these separations were made based on migrants' race or national origin.  *Id.* ¶ 79.  They further allege that "[t]he forced separation of families continued well into 2018 and took place without a hearing or any process whatsoever, regardless of the family's circumstances or the needs of the children" and that it "occurred regardless of where or how the family entered, whether they sought asylum, whether they were charged with unlawful entry or whether a family member had passed a credible fear interview."  *Id.* ¶ 59.

According to Plaintiffs, Attorney General Sessions announced a "'zero-tolerance policy' for illegal entry into the United States in violation of 8 U.S.C. § 1325(a) as pretext for . . . family separations," when, in fact, Defendants had been separating children and parents before this policy was announced. *Id.* ¶ 79.  Then-ICE Director Homan, then-USCIS Director Cissna, and then-CBP Commissioner McAleenan urged then-DHS Secretary Nielsen to detain and refer for prosecution all parents arriving in the United States with children who had violated the statute. *Id.* ¶ 80.  Officials including Secretary Nielsen and President Trump denied that there was a policy of family separation, distinguishing such a policy from the "zero-tolerance policy." *See id.* ¶¶ 82–87.  Defendants' Complaints allege in detail a variety of statements by Defendants and others in the Executive Branch, including the President, that they say demonstrate animus based on race and national origin, and which they say reveal the aim of deterrence that motivated the family separation policy. *Id.* ¶¶ 91–112.

### 3.   Class Allegations

Plaintiffs claim that the experiences endured by K.O., E.O., Jr., and C.J. are typical of the experiences suffered by putative class members.  Am. Compl. ¶¶ 180, 203, 209.  They seek to represent a class defined as:

> [A]ll minor children nationwide who: enter or have entered the United States at or between designated ports of entry; have been or will be separated from a parent or parents by DHS or its sub-agencies (CBP, ICE, or USCIS); and detained in ORR custody, ORR foster care, or CBP or ICE custody without a demonstration in a hearing that the parent is unfit or presents a danger to the child.

*Id.* ¶ 205.  Based on discovery taken in another pending case, they allege that the class could number in the thousands, and that they are ascertainable through government records.  *Id.* ¶¶ 206–07.  They further allege that common questions of law or fact relating to Defendants' alleged separation of class members from their parents make the case appropriate for class treatment under Federal Rule of Civil Procedure 23(b)(3).  *Id.* ¶ 208.  Plaintiffs further allege a

series of facts based on media reports and reports drafted by child development and psychology experts to establish the nature and extent of the trauma that children who are detained and separated from their parents in these sorts of circumstance are likely to experience. *See id.* ¶ 113–129.

### C. Procedural History

Plaintiffs filed their Complaint in the District of Massachusetts on September 5, 2018. Compl., ECF No. 1. It asserted eight counts against the individual defendants, all of which remain in the First Amended Complaint. *Compare id.* ¶¶ 199–276, *with* Am. Coml. ¶¶ 215–303. Defendants moved to dismiss, ECF No. 38, and Plaintiffs thereafter amended their complaint, rendering that motion moot. *See* ECF No. 50 (electronic order denying as moot the motion to dismiss). The First Amended Complaint added one new Count, bringing the total to nine against the individual Defendants: violation of the Fourth Amendment protection against unlawful and unreasonable seizure (Count I—newly added in the First Amended Complaint), violation of substantive due process rights to family integrity (Count II), violation of procedural due process (Count III), violation of the Fifth Amendment guarantee of equal protection (Count IV), violation of substantive due process rights relating to the punishment of civil detainees (Count V), violation of the Due Process Clause of the Fifth Amendment in connection with coerced waiver of asylum and other immigration claims (Count VI), violation of substantive due process rights in connection with the failure to provide adequate mental health services (Count VII), conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) (Count VIII), and refusal or neglect to prevent or aide in preventing conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1986 (Count IX).

The Individual Defendants then filed the instant Motion to Dismiss.  ECF No. 51.  Their memorandum supporting the motion argued for dismissal for lack of personal jurisdiction and for improper venue, as well as for failure to state a claim.  Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss. ("Mot. Dismiss Mem."), ECF No. 52.  Before Judge Hillman ruled on the Motion to Dismiss, Plaintiffs filed the still-pending Motion for Leave to File a Second Amended Complaint.  Mot. Amend.  The proposed Second Amended Complaint would add the United States as a party and would allege eight tort claims against the United States.  Prop. Compl. ¶¶ 305–45; *see also id.* ¶ 10.  Then, having realized that the Motion to amend was in violation of a District of Massachusetts local rule, the Plaintiffs filed a Motion for Leave from Compliance with the Service Requirements in Local Rule 15.1.  ECF No. 66.

In February of this year, Judge Hillman issued a Memorandum Opinion granting the Motion to Dismiss on the grounds that the District of Massachusetts lacked personal jurisdiction over the Defendants and that venue was improper in that District.  Mem. at 14.  Judge Hillman did not address the arguments for dismissal based on failure to state a claim.  *See* Mem.  He denied the Motion for Jurisdictional Discovery and the Motion to Strike the Defendants' Reply Brief, and explicitly declined to rule on the Motion for Leave to Amend, leaving it for this Court. *Id.* at 14 & n. 9.  Finally, Judge Hillman transferred the case to this Court pursuant to 28 U.S.C. § 1631, which allows a court lacking jurisdiction over an action to transfer that action to a court where it could have been brought "if it is in the interest of justice" to do so.  *Id.* at 14 (citing 28 U.S.C. § 1631).

When the case arrived before this Court, the individual Defendants filed a Notice of Related Case, ECF No. 90, suggesting that this case might be transferred to the Judge overseeing

that one.  Plaintiffs have filed objections to the Notice of Related Case.  Pls.' Obj. to Defs.'

Defs.' Notice of Rel. Case, ECF No. 92.[1]

The Court held a status conference, during which it was agreed that the parties would file

supplemental briefing.  The Court has received that supplemental briefing, from the Plaintiffs,

the individual Defendants, and the United States, which address the Motion for Leave to Amend,

the arguments that the Complaint should be dismissed for failure to state a claim, and the related

case issue.  *See* Supp. to the U.S.'s Opp'n to Pls.' Mot. for Leave to file a Second Am. Compl.

("U.S. Supp."), ECF No. 106; Supp. Br. in Supp. of the Individual Defs.' Mot. to Dismiss and

Opp'n to Mot. for Leave to Amend ("Defs.' Supp."), ECF No. 107; Pls.' Supp. Br. ("Pls.'

Supp."), ECF No. 108.  The Court has also received responsive briefing from all three groups.

*See* Resp. to Pls.' Supp. Mem. ("Defs.' Resp."), ECF No. 109; Pls.' Resp. to Supp. Brs. ("Pls.'

Resp."), ECF No. 110; Resp. to Pls.' Supp. to Mot. for Leave to File a Second Am. Compl.

("U.S. Resp."), ECF No. 111.  The Court is now appraised of the parties' respective positions on

all pending motions, and the motions are ripe for decision.

---

[1] Upon review, the Court did not find the related case identified by Defendants to be
sufficiently connected to this one to warrant transfer to a different judge of this Court.  Civil
cases are deemed related in this Court when they "involve common issues of fact" or "grow out
of the same event or transaction," among other alternatives not relevant here.  LCvR 40.5(a)(3).
If related cases are noted after both cases have been assigned, it is up to the discretion of the
judge with the later-assigned case whether to transfer it to the judge with the earlier-assigned
case.  LCvR 40.5(c)(2) ("the judge having the later-numbered case *may* transfer" (emphasis
added)); *see also* LCvR 40.5(c)(3) ("Where a party objects to a designation . . . the matter shall
be determined by the judge to whom the case is assigned.").  The purportedly related case here,
*Ms. Q v. U.S. Immigration & Customs Enforcement*, No. 18-2409 (D.D.C.), is quite different
from the instant action.  It is an individual action, not a class action like this case, and brings
different kinds of claims against only a subset of the defendants being sued here.  While it
involves some common issues of fact, those facts concern nationwide government policies that
could be shared between any number of cases.  Further, *Ms. Q* is currently stayed, with a motion
to dismiss as moot held in abeyance.  *See* Mem. Op. and Order, *Ms. Q*, No. 18-2409 (D.D.C.
Nov. 21, 2019), ECF No. 45.  A transfer would therefore not benefit judicial economy in any
meaningful way.  Accordingly, the Court declines to transfer this case.

## II.  LEGAL FRAMEWORK

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*per curiam*).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits, but rather tests whether a plaintiff has properly stated a claim for which relief can be granted.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514–15 (2002). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See id.* at 511–14; *Bryant v. Pepco*, 730 F.Supp.2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted); *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (requiring that a Title VII plaintiff allege "facts that, taken as true, render his claim of retaliation [or discrimination] plausible"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.  "In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the

complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend a complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1). Otherwise, a plaintiff may amend a pleading only with the opposing party's written consent—which has been denied in this case—or by the Court's leave. Fed. R. Civ. P. 15(a)(2). Rule 15 instructs courts to "freely give leave when justice so requires." *Id.*; *see also Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (explaining that Rule 15 "is to be construed liberally"). Importantly, "[t]he decision to grant or deny leave to amend . . . is vested in the sound discretion of the trial court." *Commodore–Mensah v. Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52 (D.D.C. 2012) (citing *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)). Generous standard notwithstanding, courts may deny leave to amend for such reasons as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Amendments that do not radically alter the scope and nature of the action . . . are especially favored." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 8 (D.D.C. 2013) (quoting *Estate of Gaither ex rel. Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011)). "Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *James Madison Ltd.*, 82 F.3d at 1099 (citing *Foman*, 371 U.S. at 181–82). Accordingly, in determining the futility of amendment, the Court applies the same standard it applies in resolving a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.*

## III. ANALYSIS

### A. Motion to Dismiss

Plaintiffs argue that the individual Defendants' arguments in favor of dismissal for failure to state a claim are no longer ripe for decision because Judge Hillman already ruled on that motion. Pls.' Supp. at 13. This is contrary to the parties' agreement with the Court in their teleconference that the remaining arguments on the Motion would be addressed in the parties supplemental briefing. The Court suspects Plaintiffs did not forget this, as they devoted two dozen pages to the merits of these arguments in their supplemental briefing. *See id.* at 14–37. The issues have been fully briefed—in two different courts now—and will be resolved here in the interest of efficiency. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

#### 1. *Bivens* Claims

Plaintiffs' claims against the individual defendants are the type of claims for damages against federal agents and officials acting under color of federal authority that the Supreme Court first authorized under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court held that federal agents acting under color of federal authority who commit an unconstitutional search or seizure could be held liable as individuals for money damages. *Bivens*, 403 U.S. at 397. In *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court extended the *Bivens* cause of action to allow for damage claims under the Fifth and Eighth Amendments. *Carlson*, 446 U.S. at 20 (allowing a federal prisoner to bring an Eighth Amendment claim for failure to provide adequate medical treatment); *Davis*, 442 U.S. at 230 (allowing a former congressional staffer to bring a Fifth Amendment claim for dismissal based on sex). Since then, the Court has

declined to extend *Bivens* and to find new implied damages remedies ten times, including earlier this year in *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020), and in the 2017 case *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1863 (2017).  *See also Abassi*, 137 S. Ct. at 1857 (collecting the eight additional cases).

A court faced with a claim that would extend *Bivens* and to recognize new implied constitutional cause of actions must undertake "a two-step inquiry." *Hernandez*, 140 S. Ct. at 743.  First, the court must "inquire whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants'" from those in any of the three Supreme Court decisions that did recognize *Bivens* actions.  *Id.* (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).  Importantly, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.*  If the claim would extend *Bivens* to a new context, the court must then "ask whether there are any 'special factors that counsel hesitation' about granting the extension." *Id.* (quoting *Abassi*, 137 S. Ct. at 1857 (internal quotations and alterations omitted)).  This involves evaluating "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abassi*, 137 S. Ct. at 1857–58.  When one or more "special factor[s]" have provided "reason to pause before applying *Bivens* in a new context or to a new class of defendants," the Supreme Court has "reject[ed] the request." *Hernandez*, 140 S. Ct. at 743.  Finally, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abassi*, 137 S. Ct. at 1858; *see also Hernandez*, 140 S. Ct. at 750 ("Congress's decision *not* to provide a judicial remedy does not compel [the courts] to step into its shoes." (emphasis added)).

The D.C. Circuit has not addressed a *Bivens* claim since *Hernandez v. Mesa*, but has issued two precedential opinions postdating *Ziglar v. Abbasi* in which it declined an opportunity to extend *Bivens*. *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020); *Liff v. Office of the Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912 (D.C. Cir. 2018). In *Liff v. Office of the Inspector General for U.S. Department of Labor*, a government contractor claimed that Department of Labor officials had violated his Fifth Amendment rights to Due Process by issuing erroneous reports about him and his business. *Liff*, 881 F.3d at 914–15. No *Bivens* remedy was available in this new context because Congress had provided a number of alternative remedies available for disputes between the government and its contractors. *Id.* at 915. More recently, in *Loumiet v. United States*, a lawyer claimed that the Office of Comptroller of Currency had carried out a retaliatory prosecution against him in violation of his First Amendment rights.[2] *Loumiet*, 948 F.3d at 378–79. This was "clearly . . . a new *Bivens* context," and the Circuit saw special factors, including again the availability of alternative remedies. *Id.* at 382–83; *see id.* at 384 (discussing provisions in the Financial Institutions Reform, Recovery, and Enforcement Act that would have allowed the Plaintiff "meaningful remedies" (quoting *Bush v. Lucas*, 462 U.S. 367, 368 (1983))).

The first seven claims brought by Plaintiffs in their Amended Complaint are potential *Bivens* claims, each based in the Fourth or Fifth Amendment. Plaintiffs seem to concede that some of these present new *Bivens* contexts, but argue that "[a]t least three" do not: "the Fourth Amendment claim for unreasonable seizure; the Fifth Amendment claim for violation of the equal protection guarantee; and the Fifth Amendment substantive due process claim based on the

---

[2] He had also brought Fifth Amendment *Bivens* claims but these were not before the Circuit on appeal after *Abbasi*. *See Loumiet*, 948 F.3d at 379.

right to adequate health care." Pls.' Mem. of Law in Opp'n to Defs.' Mot. Dismiss ("Opp'n") at 27, ECF No. 56; *see also* Pls.' Supp. at 14 (same). The Court disagrees and thinks all seven present new contexts. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," as these three claims are. *Hernandez*, 140 S. Ct. at 743.

It is unclear what cases Plaintiffs think could have established a *Bivens* action in this context, other than the original trilogy of *Bivens*, *Davis*, and *Carlson*. They cite two out-of-Circuit cases, and one from this Court that allowed the amendment of a complaint in order to properly frame a *Bivens* claim, but which said nothing about whether such a claim would actually be viable. Pls.' Supp. at 14–15 (citing *Doe v. Sessions*, No. 18-cv-4, 2018 WL 6540554, at *2 (D.D.C. Dec. 12, 2018)). Neither *Bivens*, *Davis*, nor *Carlson* dealt with the rights of noncitizens in immigration detention. In *Hernandez v. Mesa*, the Supreme Court found that the case presented a new context with only a fairly brief analysis, observing that it was "glaringly obvious" the cross-border shooting of a Mexican teenager by a Border Patrol agent involved a "new" and "meaningfully different" context from an unlawful arrest and search in New York City (*Bivens*) or sex discrimination on Capitol Hill (*Davis*). *Hernandez*, 140 S. Ct. at 743–44. *Carlson* arguably is somewhat closer to Count VII in this case, as it concerned medical treatment for a person in federal custody, but immigration detention is a different context from the federal prison system. None of the three established contexts for *Bivens* claims address the rights of noncitizens, or of minors. Whether this case presents a new context is not a close call. To find otherwise would be to say that the Court need not even *consider* what special factors might counsel hesitation—and that is clearly not the case. Accordingly, the Court proceeds to the next step in the analysis.

A number of special factors counseling hesitation are present here.  In another case challenging the executive branch's alleged family separation policy for undocumented immigrants, Judge Friedman identified three such factors.  *Mejia-Mejia v. ICE*, No. 18-cv-1445, 2019 WL 4707150, at *4–5 (D.D.C. Sept. 26, 2019).  First, "*Bivens* suits are not the appropriate mechanism to litigate objections to general government policies."  *Id.* at *4 (citing *Correctional Servs. Corp.*, 534 U.S. at 74).  Recognized *Bivens* claims "have generally been made against individuals . . . who have engaged in some personal misconduct in a direct and particularized interaction with a plaintiff, not against individuals who have applied a general policy that affected plaintiff and others in similar ways."  *Id.*  A challenge to a coordinated policy organized from the top of the Executive Branch across several departments is a different kind of lawsuit, and not one that *Bivens* has been used for in the past.  *See id.* at *4–5.  In addition, this Court shares Judge Friedman's concerns that challenging Executive Branch policies through *Bivens* actions could require discovery that "dampen[s] the candor of conversations and advice rendered by officials within the executive branch."  *Id.* at *5; *see also Abbasi*, 137 S. Ct. at 1858 ("[T]he decision to recognize a [*Bivens*] damages remedy requires an assessment of its impact on governmental operations systemwide.").

Plaintiffs dispute this characterization of their claims.  They argue that the claims in *Mejia-Mejia* challenged "broad immigration policy decisions" whereas theirs are focused on individual conduct.  Pls.' Resp. at 7 (quoting *Mejia-Mejia*, 2019 WL 4707150, at *4).  This supposed distinction is unavailing.  It is true that Judge Friedman, and not the Plaintiffs in *Mejia-Mejia*, characterized the claims at issue as "propos[ing] that senior officials should be individually liable for broad immigration policy decisions," *Mejia-Mejia*, 2019 WL 4707150, at *4, but the putative *Bivens* claims in that case were not substantively different from those here.

They were claims against Attorney General Sessions and ORR Director Lloyd—both Defendants here— and other agency officials in their individual capacities for compensatory and punitive damages.  *See id.* at *2.  The conduct challenged and the legal theory was the same.  The Plaintiffs here would reach even further into Executive Branch deliberations because they have named a former White House Chief of Staff and a Senior Advisor to the President as Defendants. The conversations and advice at issue here are closer to the office of the President and, even without considering the substantive law regarding whether they would be privileged or discoverable, they give the Court more reason to pause before allowing a *Bivens* action that could reach them.

Plaintiffs also explain that their First Amended Complaint "clearly distinguishes between the 'zero tolerance policy' for immigration prosecutions and the unnecessary and unlawful forcible separation of children from their families."  Pls.' Supp. at 19 (citing Am. Compl. ¶ 82). The Court does not see what difference this makes when it comes to the concern that allowing a *Bivens* action would require sensitive discovery relating to executive branch policymaking. Considering the class nature of the claims and the high ranks of the officials being sued, the Court does not see how prosecution of these claims could avoid looking into policymaking at the highest levels—indeed that kind of policymaking is what the Amended Complaint describes.

Another special factor identified by Judge Friedman in *Mejia-Mejia* is also relevant here. As in *Mejia-Mejia*, this suit "challenges powers that are already subject to extensive Congressional action" through the immigration code, and concerns the exercise of prosecutorial discretion by the Attorney General.  *Mejia-Mejia*, 2019 WL 4707150, at *5 (citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (noting Congress's extensive power over immigration)).  The Supreme Court later made a related point in *Hernandez*, observing in the analogous context of

extraterritorial claims brought by foreign nationals that "Congress . . . has authority in the field" but has "le[ft] the resolution of [such] claims brought by foreign nationals to executive branch officials and the diplomatic process." *Hernandez*, 140 S. Ct. at 740–50. Here, too, the Court sees "reason to pause" before creating a Constitutional cause of action for claims about the ways in which the Executive Branch operated within a statutory framework set by Congress. Plaintiffs argue that there has been no "'explicit congressional declaration' that a damages remedy is unavailable." Pls.' Supp. at 20 (quoting *Bivens*, 403 U.S. at 397). This argument misunderstands the doctrine. An "explicit congressional declaration" of that sort would be an independent ground for declining to extend *Bivens*, but is not necessary for the "special factors" analysis to prevent extension for other reasons. *See Spagnola v. Mathis*, 859 F.2d 223, 229 n.10 (D.C. Cir. 1988) (noting that the lack of an "explicit congressional declaration" "has little relevance to the "special factors" exception").

Two additional special factors carry somewhat less weight in the Court's decision not to extend *Bivens*, but bear mentioning nonetheless. First, as the Supreme Court discussed in *Hernandez v. Mesa*, the Executive Branch's "attempt[s] to control the movement of people and goods across the border" between the United States and Mexico "implicate[] an element of national security." *Hernandez*, 140 S. Ct. at 746. *Hernandez v. Mesa*, which concerned an agent standing at the physical border with a firearm, implicates national security more directly than this case. Still, the movement of people across the border always contains at least an element of national security even when, as here, many of the people at issue are children.

Finally, alternative methods of relief appear to be available to the plaintiffs. In *Mejia-Mejia*, Judge Friedman noted two class actions in the Southern District of California. *Mejia-Mejia*, 2019 WL 4707150, at *5 (citing *Ms. L. v. U.S. Immigrations and Customs Enf't*, No. 18-

cv-0428, (S.D. Cal.); *M.M.M. ex rel. his minor child, J.M.A. v. Barr*, No. 18-cv-1832 (S.D. Cal.)).  One of these is an ongoing putative class action being litigated by the American Civil Liberties Union on behalf of a class of adult parents who were separated from their children.  *See* Third Am. Compl, *Ms. L.*, No. 18-cv-0428 (Oct. 9, 2018), ECF No. 250.  Here, the proposed class is made up of the separated children, not their parents, but *Ms. L.* nonetheless suggests that claims under the Administrative Procedure Act or under the Asylum and Withholding of Removal Statutes or the Convention against Torture might be possibilities.  *See id.* ¶¶ 98–107.  The other case, *M.M.M.*, has settled, and includes a class of children.  *See* Order Certifying the Settlement Classes and Granting Final Approval of Class Action Settlement, *M.M.M.*, No. 18-cv-1832 (Nov. 15, 2018), ECF No. 99.  While there are undoubtedly differences between those actions and this one, the Court does not need to compare in detail the respective pleadings.  An alternative method of relief that cautions against extending *Bivens* need not be an alternative means of bringing exactly the same claim.  *See Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue.").  Even if there were no alternative remedy,[3] the other factors discussed above would give the Court sufficient reason to pause before extending *Bivens* to the claims presented here.

In sum, two special factors primarily give the Court "reason to pause" in this case: first, the fact that *Bivens* is not properly used as a means of challenging general government policies, and second, the fact that Congress has legislated extensively in this area without providing of this

---

[3] The Plaintiffs' proposed tort claims against the United States, which they seek to amend their complaint in order to add, are not an alternative of the sort that qualifies as a special factor in the *Bivens* analysis.  A plaintiff may pursue *Bivens* claims against officials in their individual capacities alongside FTCA claims against the United States for common law tort violations. *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016).

kind of suit.  Additionally, the fact that national security concerns are likely implicated and that alternatives forms of relief appear to be available give the Court further pause.  For these reasons, the Court declines to extend *Bivens* into this new context, and will grant the motion to dismiss as to Counts I through VII.

### 2.  Statutory Claims

Two claims in Plaintiffs' First Amended Complaint do not rely on *Bivens*, but are instead statutory: Count VIII, which alleges a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) and Count IX, which alleges refusal or neglect to provide or aide in preventing a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1986.  Am. Compl. ¶¶ 286–303.  To state a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Wilson v. DNC Servs. Corp.*, 315 F. Supp. 3d 392, 400–01 (D.D.C. 2018) (quoting *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986)).  "[Section] 1986 imposes liability upon a person who 'neglects or refuses' to prevent a wrong under § 1985." *Jackson v. Donovan*, 856 F. Supp. 2d 147, 150 (D.D.C. 2012).  This means that "a colorable claim under § 1985 is a prerequisite to a claim under § 1986." *Leonard v. George Wash. Univ. Hosp.*, 273 F. Supp. 3d 247, 256 (D.D.C. 2017) (quoting *Philogene v. District of Columbia*, 864 F. Supp. 2d 127, 132 (D.D.C. 2012)).

The individual Defendants argue that they are entitled to qualified immunity on these statutory claims.[4]  Mot. Dismiss Mem. at 40–42; Defs.' Supp. at 14–15.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be "clearly established," at the time of the officer's conduct, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft*, 563 U.S. at 741).  The legal principle to be applied must be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority,'" that "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 589–90 (quoting *Ashcroft*, 563 U.S. at 741–42).  Qualified immunity is properly evaluated at the motion to dismiss stage. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A defendant bears the burden of pleading and proving the defense. *Harlow*, 457 U.S. at 815.

Trial courts have discretion to decide which prong of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236; *see Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) (noting that "lower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)).  On the "clearly established" prong, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Abassi*, 137 S. Ct. at 1866 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (*per curiam*) (internal quotation

---

[4] The individual Defendants argue that they are entitled to qualified immunity on all nine claims, but the Court need not address whether they would be entitled to qualified immunity for the *Bivens* claims because those fail to state a claim for other reasons.

marks omitted)); *see also id.* at 1867 ("[Q]ualified immunity protects 'all but the plainly

incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs,* 475 U.S. 335,

341 (1986))).  As a defense to claims under § 1985(3), qualified immunity is available not only

when officers reasonably might not have known that the actions they allegedly conspired to take

were unlawful but also when officers reasonably might not have known that their planning could

be labeled a conspiracy under the statute.  *Abassi*, 137 S. Ct. at 1867 (granting qualified

immunity to defendants because "potential liability for this statutory offense would not have

been known or anticipated by reasonable officials in their position").

Following *Abassi*, Defendants argue that one reason why Plaintiffs' two statutory claims

fail is that it is not clearly established that § 1985(3) can "even appl[y] to federal actors who are

formulating general policy."  Mot. Dismiss Mem. at 64.  Under the "intracorporate-conspiracy

doctrine," "there is no unlawful conspiracy when officers within a single corporate entity consult

among themselves and then adopt a policy for the entity."  *Abassi*, 137 S. Ct. at 1867 (citing

*Coppwerweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769–71 (1984)); *see also id.*

("Conspiracy requires an agreement . . . between or among two or more separate persons.  When

two agents of the same legal entity make an agreement in the course of their official duties,

however, as a practical and legal matter, their acts are attributed to their principal.").  The

Supreme Court in *Abassi* observed a longstanding dispute among the lower courts regarding the

applicability of the intracorporate-conspiracy doctrine to alleged conspiracies to violate civil

rights in violation of § 1985.  *Id.* at 1868 (citing discussion of the dispute in *Bowie v. Maddox*,

642 F.3d 1122, 1130–31 (D.C. Cir. 2011)); *see also Apollo v. Bank of Am., N.A.*, 315 F. Supp. 3d

436, 439 (D.D.C. 2018) (indicating the question remained thirteen months after *Abassi*).  The

Court in *Abassi* held that the defendant officials sued under § 1985 were entitled to qualified

immunity because the division among the courts concerning the intracorporate-conspiracy doctrine "demonstrates that the law on the point is not well established" and that therefore "a reasonable official lacks the notice required before imposing liability." *Abassi*, 137 S. Ct. at 1868.

Plaintiffs attempt to distinguish *Abassi* by arguing that the defendants there "all worked for the *same* Department of the Executive Branch" while "many of the Defendants here worked in *different* Departments." Pls.' Supp. at 34; *see also* Opp'n at 60–61. Intracorporate-conspiracy doctrine should not apply, Plaintiffs argue, "[b]ecause the [D]efendants alleged to have conspired . . . are from distinct entities, performing distinct functions and making independent decisions." Pls.' Supp. at 34. While this does identify a factual distinction from *Abassi*, the Court does not think it makes any difference given *Abassi*'s reasoning. In *Abassi*, without reaching a holding one way or the other, the Supreme Court explained that "conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under § 1985(3)." *Abassi*, 137 S. Ct. at 1868. But "open discussion among federal officers is to be encouraged," *id.*, as much across departments as much as within them. It is especially the case where, as here, conversations among White House officials and heads of departments are at issue. For example, if there is good reason for the Attorney General to be able to count on frank and open conversations with the heads of various Department of Justice divisions, then there is at least equally good reason for the Attorney General to be able to have the same kinds of conversations with White House officials.

Moreover, at least one court in this district, and numerous district courts around the country, have applied the intracorporate conspiracy doctrine to different entities within state and

local governments.  *See Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 117 (D.D.C. 2012)

(applying intracorporate conspiracy doctrine to an alleged conspiracy involving the D.C. Chief of

Police and the former D.C. Attorney General); *see also, e.g.*, *Guichard v. Town of Brookhaven*,

26 F. Supp. 3d 219, 227–28 (E.D.N.Y. 2014) (same for an alleged conspiracy involving a town,

its waste management department, and employees of each); *Dunlop v. City of New York*, No. 06-

cv-0433 (RJS), 2008 WL 1970002, at *9 (S.D.N.Y. May 6, 2008) (same for an alleged

conspiracy involving the New York City mayor, police commissioner, New York County

District Attorney, and various other officials).  It is irrelevant whether the Court would follow

these cases—which have no precedential weight here—because it is enough for defendants to

show that the law is not clearly established in Plaintiffs' favor.

Another good reason to think the intracorporate-conspiracy doctrine might apply here is

that Plaintiffs recognize that every Defendant—from the Chief of Staff down to the unnamed

agents—acted within the scope of his or her employment.  *See* Am. Compl. ¶ 31 ("At all relevant

times, the Defendants have acted under color of federal law in the course and scope of their

duties and functions as agents, employees, and officers of the United States in engaging in the

conduct described in this Amended Complaint.").  The intracorporate-conspiracy doctrine

protects only employees acting within the scope of their employment.  *Mehari v. District of*

*Columbia*, 268 F. Supp. 3d 73, 80 (D.D.C. 2017); *see Abassi*, 137 S. Ct. at 1868 ("These

considerations suggest that officials employed by the same governmental department do not

conspire when they speak to one another and work together *in their official capacities*."

(emphasis added)).  The Defendants here have official duties that require them to speak and work

with other officials outside their own departments.  The non-identified ICE Agents and CBP

Agents—all organized under the Department of Homeland Security—must communicate and

coordinate with the non-identified ORR officials from HHS in order to process and care for UACs.  White House officials and heads of agencies must do the same with heads of various departments.  If the intracorporate-conspiracy doctrine can apply to civil rights claims—and *Abassi* states that it might be able to—there is little reason to think its reach would stop at cross-department communications within the scope of federal officers' official duties.  As Plaintiffs acknowledged, these officials acted under color of federal law as "agents, employees, and officers *of the United States*," not on behalf of their individual agencies.

None of this is to say that the intracorporate-conspiracy doctrine necessarily applies to conversations and planning that takes place across executive departments, but only that the question is sufficiently open that the issue is not "beyond debate."  *Ashcroft*, 563 U.S. at 741.  While Plaintiffs have attempted to distinguish the cases cited by Defendants—including *Abassi* and the state and local government cases—they present no cases to establish affirmatively that liability for Defendants' alleged conduct is clearly established.  *See* Pls.' Resp. at 13–14.  Simply distinguishing Defendants' cases, even if done effectively, would not carry the Plaintiffs' burden.  The legal conclusions necessary to find in Plaintiffs' favor "cannot be clearly established" and thus Defendants "would not have known with any certainty that the alleged agreements were forbidden by law."  *Abassi*, 137 S. Ct. at 1869.  The individual defendants are therefore entitled to qualified immunity on the § 1985(3) claim, *see id.*, and so the § 1986 claim necessarily fails along with it, *see Leonard*, 273 F. Supp. 3d at 256.

## B. Motion for Leave to File a Second Amended Complaint[5]

"Courts may deny a motion to amend a complaint as futile . . . if the proposed claim

would not survive a motion to dismiss." *James Madison Ltd.*, 82 F.3d at 1099.  Plaintiffs'

Second Amended Complaint makes identical *Bivens* and statutory conspiracy claims against the

individual Defendants.  Amending these claims would be futile because the proposed

amendments change nothing about them and they would not survive a motion to dismiss for the

reasons explained above.  This would leave only for this Court's consideration the proposed tort

claims against the United States.

The United States argues that Plaintiffs should not be permitted to add these claims

because Plaintiffs never filed a proper administrative claim, U.S. Supp. at 5; *see also* U.S. Resp.

at 2 n.1, and that even if they did, they failed to exhaust their administrative remedies before

filing their initial complaint in this case.  U.S. Supp. at 6.  Plaintiffs' first Complaint in this case

was filed on September 5, 2018.  *See* ECF No. 1.  By their own admission, Plaintiffs did not

present their administrative tort claims pursuant to the FTCA until October 9, 2018.  *See* Mot.

Amend ¶ 2.  The United States acknowledges that "the case law on [allowing amendment in

circumstances like these] is not uniform."  U.S. Resp. at 4.  It points, however, to *Schneider v.*

*Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), in which amendment was not allowed under the

same circumstances presented here.  *Id.* at 269–70; *see id.* at 270 ("Allowing claimants generally

---

[5] While litigating in the District of Massachusetts, the Plaintiffs filed a Motion for Leave from Compliance with the Service Requirements in Local Rule 15.1, ECF No. 66, based on their apparent failure to comply with that local rule in the filing of their Motion for Leave to File a Second Amended Complaint.  Judge Hillman did not rule on the Motion for Leave from Compliance, and it remains pending.  In their supplemental briefing in this Court neither the United States nor the individual Defendants have mentioned this motion, except in passing.  U.S. Supp. at 2 n.4.  The motion will be neither granted nor denied.  There is no need for the Court to grant leave from compliance with a local rule from a different district that has no bearing on this Court.  The motion is therefore found to be moot in light of the transfer of the case to this Court.

to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." (quoting *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999))).  Plaintiffs point to no binding precedent to the contrary, nor have they identified any decisions contrary to *Schneider* from this district.  *See* Pls.' Supp. at 11.

Under the circumstances, the Court sees no reason to allow amendment.  Judicial economy would be better served by the filing of a new action.  Because the claims against the individual Defendants fail to state a claim, there is nothing to be gained in terms of judicial efficiency by litigating the claims against the United States in this action.  The *Schneider* issue derives from the fact that the initial complaint in this action was filed before administrative remedies were exhausted pursuant to the FTCA.  This would not be a problem in a new suit.  The issue of whether administrative remedies have *ever* been exhausted will remain, but Plaintiffs now have the opportunity to address these issues before instituting a new case.  Plaintiffs do not argue that they will be prejudiced if amendment of their FTCA claims is not allowed.  *See id.* Their only judicial economy argument in favor of amendment is that discovery on the FTCA claims will overlap substantially with discovery on the *Bivens* and conspiracy claims.  *Id.* at 12.  But that will not be the case because those claims have failed.  With nothing else remaining in this case, there is no benefit to Plaintiffs to having their FTCA claims litigated under this case number.  To the contrary, keeping the cases separate may benefit Plaintiffs in that they will be able to immediately appeal the dismissal of their *Bivens* claims now.  But if the FTCA claims were added to this case Plaintiffs would have to await resolution of the FTCA claims before appealing the dismissal of the *Bivens* claims.

"The grant or denial of leave to amend is committed to a district court's discretion" and "futility of amendment" is a proper basis for the exercise of that discretion.  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Here the Court will deny leave to amend. Amendment would be futile given the procedural hurdles that Plaintiffs have apparently failed to clear, and in filing a new action Plaintiffs will have the opportunity to cure one or more procedural defects.

## IV.  CONCLUSION

For the foregoing reasons, the individual Defendants' Motion to Dismiss (ECF No. 51) is **GRANTED**.  Plaintiffs' Motion for Leave to File a Second Amended Complaint (ECF No. 64) is **DENIED**.  Plaintiffs' Motion for Leave from Compliance with the Service Requirements in Local Rule 15.1 of the District of Massachusetts (ECF No. 66) is **FOUND TO BE MOOT**.  An order consistent with this memorandum opinion is separately and contemporaneously issued.

Dated:  June 23, 2020

RUDOLPH CONTRERAS
United States District Judge